FILED

APR X8 2016

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

FILED

APR X8 2016

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  Scott Robinson
   PO BOX 2234 (Mailing Address)
2  351 Sunset Drive, Suite C (Physical Only)
   Antioch, CA    94509
3  (510) 610-7206

4            United States District Court

5            Northern District of California

6  Jenetta L. Price, Pro Se          | Case No.: 15-CV-04631-RS

7  Scott A. Robinson, Pro Se

8            Plaintiff,             | CIVIL
                                    | COMPLAINT UNLIMITED
9  vs.                              | (Amended)

10 Barack Obama Administration of the
11 Presidency

12 United States of America

13 Stephen G. Moseley, employee of
   research project group
14
   Tom Horvath, employee of research
15 project group.

16 John Doe 1-9

17          Defendant

18

19

20                    **Introduction**

21

22     Plaintiff's Jenetta Price and Scott Robinson (hereafter referred to as

23 "Robinson" and "Price" or "Plaintiff('s)") bring this complaint Pro Se for

24 being uninterrupted forced party's to a government program starting in

25 December 2014 and lasting until April 2016, for which they had no knowledge

26 of prior and no ability to refuse once they understood what was occurring,

27 which violated several of their rights. The program was tormenting at times,

28
   CIVILCOMPLAINT UNLIMITED - 1

sexually offensive as well as harmful to their psychologies. It involved a study of communications without electronic device and a medical process previously unknown to them that included electrical stimulation of the body through frequency wave of the orbital satellite system, in conjunction with the use of computers from offsite test operators, to which they had no idea of the location. Research Project Operators were repeatedly asked to cease testing and conducted operations on behalf of governmental order.

Robinson was the owner of Compressed Solutions West, LLC, a California company also located in Antioch, as well as an additional location in Pennsylvania. Plaintiffs were involved in a romantic relationship and shared residence at 612 Eaker Way of Antioch, California and later 25 Meadowlark Drive of Henderson, Nevada. Both Plaintiffs show traits and behaviors consistent with psychiatric disability, within the standards recognized by the American with Disabilities Act.

## JURISDICTION AND VENUE

The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331 and 28 U.S.C. §§1346(b) and 2671 et seq. Venue is proper as Plaintiff the events giving rise to this claim began in this judicial district.

Plaintiffs allege the following to be fact:

## Factual Allegations

CIVILCOMPLAINT UNLIMITED - 2

1.)     Starting on or around December 18, 2014 and continuing until April 2016, medical processes involving a remote or distanced form of Neuromodulation with electrical stimulation or processes with similarities to Neurostimulation of the body (with focus to the cerebral cortex) through satellite frequency (similarly known as "Radio Wave") technology occurred on Plaintiff's under a specific Barack Obama Administration White House work order that specifically authorized a long term research and development study of advancement of satellite technology and the benefits that could be conceded for the United States and its citizens in both the Medical field as well matters relating to national defense with regards to the war on terrorism.

2.)     The work order stated for test subject(s) being selected at random, with potential subjective ties to street based business's commonly known as a "racket" to show thought parallels with respect to radical extremist ideological thought process. The party selected for the study by the administrators of the project was Robinson, with Price being additionally included due to the pair's domestic relationship and living situation making them both viable.  They contend to being the only two parties selected for this program domestically within the United States and throughout the entire world.

3.)     Plaintiffs firmly deny being involved with any racket's and question the thought process behind their selection as candidates for this research project, to which they were given no right to object

CIVILCOMPLAINT UNLIMITED - 3

being forced into documented study.  Robinson states firmly his
business is within complete compliance of all local, state and Federal
Law's and denies him nor business has any ties to any organized
racket's or organized crime syndicates, nor has he been accused or
charged of being involved in anything similar in either criminal or
civil courts within the United States or abroad and "the thought of
anything even comparable is humorous and absurd".

4.)     Neuromodulation with electrical stimulation is a medical process
recognized by the Food and Drug Administration, and standardly is
performed by licensed doctors in clinical settings after patients have
been informed of their rights with respect to treatment and provided
with potential adverse health effect information.  Robinson was
informed from commentators that him and Price were the first two
parties that had undergone satellite based Neurostimulation for an
extended time period, to which they still objected the forced satellite
processes and wanted the process ceased as it was against their freedom
to choose Medical Care, as well as religious objections.  Their
Constitutional Rights were invoked verbally for days into weeks in the
first month of the research study and denoted by the projects operators,
although blatantly ignored and never abided by.

5.)     Throughout the term of the research project, Plaintiffs were
tracked illegally through defense style technology utilizing global
positioning software which made it possible for the frequency wave

CIVILCOMPLAINT UNLIMITED - 4

communications to follow them nationwide including during domestic air travel and were documented illegally in violation of their Constitutional Rights, and at times compared to radical idealists in prejudged expectations by commentators.

6.)     Starting December 2014 and throughout term of the programs length, auditory sounds mimicking sexual intercourse would be coming inbound into the household at random from frequency style communications similar to a radio noise, in which Plaintiff Robinson would hear coming from wall's and vents, often times assuming it to be infidelity of Plaintiff Price, whom would at first often get reprimanded, and it later turned out to be part of the research testing itself, leaving Price psychologically scarred later and leaving permanent strain on their relationship, which was very healthy before the beginning of the projects term.

7.)     A central element to the project involved a study of back and forth non-device communications, which also implored the use of Electroencephalography (EEG) software or similar by satellite use, in which both Plaintiff's thoughts were being read and discussed in a back and forth communications at times in a way EEG software being used as well to translate the thought pattern into written and spoken dialogue to the research test group.

CIVILCOMPLAINT UNLIMITED - 5

8.)     Both Plaintiff's objected to this throughout the term of the project, and at no times was it ceased until the project was finished, or until Price was removed from being a viable test subject, as she later was found to be pregnant 10 weeks.

9.)     Robinson could often hear a distinct repeat of his sentenced thought, at times in various different auditory tones which added psychological effect.  Price started hearing verbal communications in April 2015, which were thought to be the beginning of a mental health disorder until later, during which the couple turned to physicians for advice at the time.

10.)    Robinson began hearing verbal communications on or around June 2, 2015 and immediately deemed to be the same style based on Price's description, however different in verbatim and not mental illness related.

11.)    Robinson started being told an unknown story, starting on June 12, 2015, in which he which he would hear storyline and often confuse with real life which would later add trauma and concern to both Plaintiff's as arguments ensued due to claims from the story, such as Price getting married over Memorial Day on a trip to New York.  He would often wake up in the middle of the night and the story would be ongoing, as if he were awake or as if a recording were playing.

CIVILCOMPLAINT UNLIMITED - 6

12.)     Communications research to both parties were 24 hours a day, 7

days a week nonstop without relent at times, similar to a verbal attack

at times, with sexually crude and offensive humor mixed in at random

and unexpected moments. Words were often entrancing in quantity as well

as length of dialogue. Communications were specific to individual

Plaintiff's ears due to some type of encoding or encryption, as neither

Plaintiff could hear each other's communications or thoughts.


13.)     Commentators often would tell Robinson "how smart he was" or

similar comments involving the word "smart" in excess of several

hundred times an hour causing distress with Robinson.  Robinson was

often told "he could not do what he wanted within his own home" unknown

to what it meant. He was told his business competitor in Berkeley was

related to the project through family, which at the time he did not

know to be not local to the Antioch or Bay Area's.


14.)     Dreams during deep sleep patterns were altered through technology,

in which concepts are characters were placed into both Plaintiff's

dreams, making sleep not an escape from the Plaintiff's description of

the matter being "torture".


15.)     Both Plaintiff's memories were against their will conjured

through the electrical stimulation from frequency technology in order

to document them, and their pasts as well as build profile through

image documentation and dialogue.

CIVILCOMPLAINT UNLIMITED - 7

16.)    Subjects were subjected to non-stop interrogations, including times when they were asleep, which could be described as technology based "enhanced interrogations". Robinson often invoked his rights towards the forced and at times illegal questioning and "thought picking" of the commentators, which were ignored time and time again such as right to attorney.

17.)    Robinson said numerous times he would have "rather have been water boarded for three weeks straight" rather than suffer through the seeming torture of the nonstop privacy invasion and dignity loss, as well as he felt cruelty of the subjective treatment and isolation that grew from other parties not believing in the detail of what was and had occurred. Robinson often compared it to a jail sentence in prison or punishment without trial. He made comparisons to rather being detained within Guantanamo Bay.

18.)    Both parties contemplated suicide multiple times during this term although never discussing it together, and the actions taken at times by them could be deemed questionable if it was attempted subconsciously in action.

19.)    Communications could often be described as "torture by word" involving a never ending story, with false endings to the ordeal coming almost daily throughout the months, often trying to leave American

natural born citizen Robinson jarred or psychologically battered from false liberation.

20.)    Communications were purposely annoying, confusing and deceiving, often emotional and invoking psychological distress, including one night where images of a post-mortem Chris Farley were flashed at Robinson during his sleep that night, while in Chicago in July 2015 as well as images of anal prolapse and nudity.

21.)    Friends, Peer's and family all would tell Robinson he looked miserable during the projects term, for which he truly was and stated quality of life was "miserable and less than worth living through, due to the constant incessant communications that were distracting him from his already short life span".

22.)    All network systems were breached without any investigative probable cause or search warranted consent by parties involved with the research group sometime between May and June, inducing flood of unknown computer applications and files onto computers and electronic devices through their Bluetooth networking or wireless (WI-FI) cards at both the residence and workplace of Robinson, causing gross hardship to the business and making it lose its place in local market dominance.

23.)    Robinson bought almost a dozen portable cellular phones over the course of the period of June through November 1 2015, finding the same

results that the devices had been breached, and due to being unsure if
it were business competitors through spyware, Robinson ended up
purchasing over a dozen computers as well as a similar amount of
prepaid telephones through the term, almost always finding the same
results.   Robinson was led to believe he could end the communications
by pouring craft beer onto the hinges of a Lenovo laptop computer.

24.)      Communications were purposely annoying, confusing and deceiving,
often emotional and invoking psychological distress, including one
night where images of a post-mortem Chris Farley were flashed at
Robinson during his sleep that night, while in Chicago in July 2015 as
well as images of anal prolapse and nudity.

25.) Friends, Peer's and family all would tell Robinson he looked
miserable during the projects term, for which he truly was and stated
quality of life was "miserable and less than worth living through, due to
the constant incessant communications that were distracting him from his
already short life span".

26.)      Price was sent to the Contra Costa County Psychological Facility
several times, in total approximately 8 times throughout the ordeal
between Contra Costa and San Francisco Counties facilities including
one time when Price brought a sharp object to Compressed Solutions
with intent to harm in confusion due to early stages of the testing
process.   Price spent three weeks in a psychiatric facility in New

CIVILCOMPLAINT UNLIMITED - 10

York in May 2015, prior to Robinson's exposure to the communications and realizations that it was not mental illness related. Robinson diligently attempted to minimize Price's involuntary commitments to psychiatric care once he was aware of the non-mental illness related nature of the communications as well as the program in general. Unknown prescription medications were forced on Price during her time at these psychiatric care facilities.

27.)     Robinson's parent's assumed him to suffer from psychiatric illness as well as serious drug addiction from the ongoing, including one time when Robinson's father showed up a day after Price had an outburst and she had broken a large glass window, luckily without harming herself. Antioch Police were negligent in even starting a search for Price, whom had taken off on foot after breaking the glass door and punished Robinson by involuntarily committing him that day to County psychiatric facility, to which he was released in under an hour from on a required 72 hour hold further proving he was involuntarily committed without reason, to which he still has outstanding medical debt. The Following day, Antioch Police Officer, unknown identity, made an effective point to tell Robinson's father his son was comparable to the "tweekers within the area" and that most likely was what was to be ascertained from Robinson's behavior and claimed verbally that Robinson was a known drug user, which there was no legal basis other than officer's feelings of intuition to this claim as Robinson had never had a drug or suspicious activity altercation of

CIVILCOMPLAINT UNLIMITED - 11

1   any sort prior with Antioch Police. It was estimated only senior

2   leadership of the Antioch Police had knowledge of the research teams

3   ongoing although never confirmed.  Robinson reached out to established

4   community leader and Police Chief Cantando over two dozen times via

5   telephone, never being able to reach him directly on the phone.

6   Severe arguments ensued between Robinson and his parents, as he had no

7   way of making them believe the reality of ongoing matter, which

8   ultimately damaged his credibility, and causing severe financial

9   strain on Compressed Solutions, as his father provided lending

10  indirectly to Robinson, which he used in financing his business

11  through use of American Express Green Card.

12

13

14  28.)    Officer Speers from the Pittsburg Police was the liaison for the

15  County Mental Health Department for the Antioch Police Department, and

16  an unknown superior from within her division repeatedly called

17  Robinson's parents just days before Christmas, and illegally leaked

18  confidential details of Robinson's medical privacy including

19  documented data from his visits to hospitals within the County to

20  Robinson's parents in violation of his rights to privacy and in

21  further defamation of his character, as he was an adult at the time of

22  care further providing an incorrect image of their son causing further

23  tension and argument as well as stress within the family, whom they

24  formerly provided open term lending to and further restricting his

25  ability to run his business causing constraint at Christmas time.

26

27

28

CIVILCOMPLAINT UNLIMITED - 12

29.) Price's sister, Amberly, was resident of the Antioch household until June 1, 2015 at which time she relocated, due to emotional stress. Robinson was often led to believe through the confusing noises that another party was living within the household, often staying in Price's sisters room. The noises would often antagonize Robinson daily especially at night with sexual sounds of super human performance, as well as taunting of Robinson physically in which it would sounds as if another party was playing with Robinson's door as he was in bed. There was one occurrence where Robinson got so fed up with the matter that he took to kicking in Price's sisters door, only to confusingly find nobody there. There were times where Robinson would enlist the assistance of associates from work to come and look for the unknown occupant(s) that produced audible presence that never in actuality existed, further damaging his professional credibility and private reputation with Price's family.

29.) The Manager for Compressed Solutions, Sara Gabriel, quit her employment as she felt unsafe around Robinson, due to the erratic behavior he was exhibiting. Core accounts to the business often discussed behind Robinson's back that "he appeared to be losing his mind", including one distributor who stole approximately $55,000 in cylinder assets from the business, which insurance never compensated for, which was reported to the Antioch Police in which Robinson never got even a single phone call inquiring about the matter as if his

business.   The matter was also reported to the Chicago Police, as well as insurance company agents.

30.)   Robinson was late on his rent every month from July through moving out of the residence, due to the losses Compressed Solutions quickly took from June on due to the distraction from communications as he was unable to safely function at his employment which he built from its inception without lending.

31.)   Plaintiff Robinson was told through believable communications that he could make the covert project cease if he were to do a number of things, including destruction of personal property, including cherished family memorabilia as he was told a number of objects in vague conversation were involved later proving to be untrue and as well as minor nuances to the house of Kort Jackson he rented in Antioch.   Plaintiff Robinson in total caused $28,500 in damages attempting to cease the communications which derailed his and Plaintiff Price's lives from life quality, safety and happiness as well as their careers.

32.)   Robinson spent hours within the household of Kort Jackson causing damage to the structure, including lengthy terms within the attic with exposure to fiberglass from the attic, near electrocution from exposed wiring from damages caused as well as potential of severe puncture from exposed glass he was told to destroy as he was led to believe

CIVILCOMPLAINT UNLIMITED - 14

toxic fumes from castor bean, which is used to manufacture chemical

agent ricin were at moments pumped into the household or poured in oil

form onto materials such as blankets or pillows.  He was led to

believe the dog was given a bath in Arsenic at one point, causing a

very emotional disagreement between Price and Robinson as the dog was

immediately quarantined and Robinson lovingly but authoritatively

carried Price away from the dog as she cried uncontrollably to much

confusion.

33.)    Holographic Images of people unknown were used throughout the

ordeal to illegally induce friction between the two parties, often in

deceiving ways in order to make Plaintiff Robinson think that

Plaintiff Price was unfaithful during moments, attempting to predicate

argument and leaving Plaintiff Price further psychologically scarred.

34.)    Semiconductor boards for Robinson's television were found to have

been modified, with chewing gum found to be placed over a specific

portion of it, which related to remote control ability, meaning it was

being administered settings from off-site.  Gamma radiation from light

was being added to his body through his eyes, as well as any unknown

visitors to the household through electronic device including

televisions and laptops, through unknown remote control of devices.

35.)    Robinson spent over $4000 in security camera's, including

multiple covert model's which ran off of wireless internet or "Wi-Fi".

CIVILCOMPLAINT UNLIMITED - 15

Cameras were said to have been tampered with in one dialogue, in which the use of holographic images put an unknown masked gentleman assumed to be a local D.E.A. agent or potential murderer impersonating one within the room of Robinson, making direct threats towards shooting him which Robinson thought to be humorous and not serious. The identity of this image was later generally established to be a partial image of defendant Moseley.

36.)    Noxious smells from chemical components were pumped into the household through both the fan system and the air conditioner's liquid intake at random times, producing moments in time where asphyxiation potentially could have occurred, with unknown chemical additive related to the processes most likely. Suspicious and at times unknown and unscheduled contractors did work to both the inside and outside of the household utilities, as well as the fan and air conditioning system, but never to the inside when Plaintiffs were home particularly the air conditioner which was repaired twice from a non-working stage to running while tenants were not home. Frequency wave was intentionally used to alter Plaintiff's senses of smell at times, in conjunction with chemical effect.

37.)    The name of a "Desmond" was found on the Pacific Gas and Electric account, in which it was ordered for the natural gas services to stay on, which was generally assumed to be Desmond Bitner of the Antioch Police, a high ranking sergeant. A Strange address in Modesto was

also confirmed by PG&E employees to be listed at one time on the power bill.

38.)     Robinson was frequently led to believe that there was a gas leak, as well as need for the County Bomb Squad to come and inspect various items.  Robinson was frequently led to believe there was a bomb within the refrigerator, the washing machine as well as an elliptical exercise machine.  Robinson was led to believe that a snuff movie film was set to be filmed at the property early on, and he was lucky to have caught on to the plans of the production.

39.)     Plaintiff Robinson was led to believe early on that several neighbors were responsible for teaching him what was deemed a "morality lesson", including several tenants from nearby houses.

40.)     Robinson was led to believe that a neighboring solar panel was a partial cause of the incessant and near insanity causing communications, which at times had increased word speed through the use of technology in conjunction with several speakers within the same auditory or vocal tone.

41.)     Both Plaintiffs show traits and behaviors consistent with psychiatric disability, within the standards recognized by the American with Disabilities Act.

42.)   Plaintiff was intentionally led to believe that the electrical system of the house was modified and that he could without training fix it by making impromptu modifications, which nearly cost him his life.

43.)   Plaintiff destroyed a refrigerator, under the thought process that he was disarming a bomb, only to feel unintelligent to witnesses later, and even later legitimately calling the bomb squad as he was led to believe over 10 times there was a bomb in the house.

44.)   Plaintiff Robinson was led onto the roof of the household several times to look for antenna's or electronic devices that could be transmitting the auditory communications inbound into the home, where it was often amplified auditory from the research team emitting audio through electronics, such as televisions as well as modifications made to the semiconductor board of the fan system in the attic.

45.)   Plaintiffs were never consented or willing parties to any research testing, experiments, programs involving studies or Medical Process to any individual, group or organization with respect to the context of this claim, nor were they given the opportunity or ability to stop or get out the project once they had understood its on-goings. Plaintiff's often asked of the side effects of the unconsented medical process to very little feedback, similar to isolation style treatments of the Polio era.

CIVILCOMPLAINT UNLIMITED - 18

46.)     Plaintiffs were against their will forced into Medical Process through frequency wave, which is unavoidable in conjunction with satellite monitoring through Global Positioning software as it is applied from a distanced location by unknown and potentially unqualified operators, in conjunction with in unconventional standards not guaranteed or verified to be consistent with a Medical Care Facility or Hospital, in what they felt to be consistent "cruel and unusual punishment" due to the lack of informed consent information, as well as legitimacy to why or how they were hearing other voices within their head's besides their own, whom at times were saying very strange cliché statements in addition to very crass high school unintellectual humor and the basis for their lives being sidetracked illegally under the guise of legal governmental action. The inability to refuse the Medical processes of the project had a profound impact on both Plaintiff's psychology, without a doubt forever altering their lives dramatically and possibly endangering any chance of a positive future.

47.)     Robinson informed the Federal Bureau of Investigation bits and pieces of the on-goings over several thousand times, at times 5 times daily between telephone, website and written letter through US Mail. At no time did he ever get a return correspondence.  As early as June 20, he began reporting to the Federal Government that either "torture or a research study involving electromagnetic waves" was occurring

CIVILCOMPLAINT UNLIMITED - 19

within his household asking friends on his social media page to
contact the F.B.I. to report the matter as he was getting no response
repeatedly.

48.)     Chief Allan Cantando of the Antioch Police made personal
appearances upon service call at Robinson's house, which Plaintiff
noted that was highly unusual, and would always have a different
officer's name badge on his shirt.  Antioch Police were as well
notified through US Mail, as well as online reporting of the on-
going's as they were very punitive when appearing at Plaintiff's home,
including forcing the Plaintiff's to be involuntarily committed
several times without legal reasoning or justification in an almost
punitive fashion including one time where Plaintiff was released from
the County facilities in less than 1 hour on a 72 hour assessment, as
doctors could not find a reason as to why he was being detained
psychologically.

49.)     The Manager for Compressed Solutions, Sara Gabriel, quit her
employment as she felt unsafe around Robinson, due to the erratic
behavior he was exhibiting.  Core accounts to the business often
discussed behind Robinson's back that "he appeared to be losing his
mind", including one distributor who stole approximately $55,000 in
cylinder assets from the business, which insurance never compensated
for, which was reported to the Antioch Police in which Robinson never
negligently got even a phone call inquiring about the matter.  The

CIVILCOMPLAINT UNLIMITED - 20

matter was also reported to the Chicago Police, as well as insurance company agents.

50.)    Robinson was late on his rent every month from July through moving out of the residence, due to the losses Compressed Solutions quickly took from June on as he rarely attended work due to the distraction from communications as he was unable to safely function in a medium industrial setting at his employment working around bottled gases and chemicals which he built from its inception without lending.

51.)    Robinson was unsure at times whether it was research or legitimate torture and often reported it in varying contexts to law enforcement, although it was reported almost daily to several different agencies at times for months, including several dozen days where Robinson spent the entire daylight period contacting law enforcement state to state, often finding just about all to not believe his matter due to the modern technology involved.

52.)    Robinson was told through communications there was a chance of ceasing communications had he moved a mirror from the bathroom, which ended up shattering and nearly costing Robinson his arm, and sustaining deep injuries, as well as a trip to County Psychological Facility by local Police.  Plaintiff acknowledges he was very lucky to have survived that day, as large two-foot glass mirror shards came inches from his abdominal section, legs and genitalia.

53.)     Robinson while walking his dog, Kye, on the street behind their

Antioch house noticed an odd gentleman averting eye contact while

walking by on the street and later figured out his identity to be that

of Steven G. Moseley of Downingtown, Pennsylvania, Plaintiff's

childhood hometown and later confirming his identity through

communications at first as "Steve Lee" and later as his full born

identity.  Robinson became adamant that the speaker from

communications is indeed the same voice tone as the party he knew

prior from schooling, as certain knowledge only that party would

generally know was mentioned, including former classmates as well as

habits of a known teacher.

54.)     The names of several of Dan Horvath's family, including his own

were mentioned through the research testing process and put together

from Plaintiff's memory including the identity of one of the

commentators Nick to be Tom Horvath.

55.)     Researchers would often use confusing statements during the

course of communicating, in order to illegally conjure image via

Plaintiff's memory violating laws regarding illegal search and seizure

as well as enhanced questioning of detainee's, which were then

documented by the research team as the EEG technology from satellite

would transcribe the image for the researchers.

CIVILCOMPLAINT UNLIMITED - 22

56.)     Both Plaintiff's begged mercilessly for the communicative parties
to leave them alone, as their lives crumbled over the course of
several months from June to December to very little reception.

57.)     Price was so psychologically offset due to the medical process
that she took to sleeping in Golden Gate Park in San Francisco
starting on or around September 23, during which Robinson searched
desperately in daily attempts to keep her from severe injury from
trolley and automobiles as well as frostbite into early November.
She could not keep a cellular phone due to her diminished capacity
state at the time and frequently was committed during this period to
San Francisco County Psychiatric Care Facilities, in which Robinson
was often stonewalled from obtaining information on her whereabouts as
well as condition.

58.)     Robinson found no possibility of obtaining legal guardianship
through the local court system, or methods of filing legal order for
temporary care during this period for Price for her reduced capacities
due to the electromagnetic wave based exposure during this time period
when electricity stimulation was noticeably present and behavior was
impacted, which late September through November were by description
the most noticeable. Robinson spent an amount in excess of ten
thousand dollars during this 45-day period attempting to find her from
hanging flier advertising posters on every light pole in several
neighborhoods for approximately 10 hours daily, as well shield her

CIVILCOMPLAINT UNLIMITED - 23

life from danger, and encourage her back under typical shelter once he

would find her.  As soon he would be able to remove her to be in safe

surroundings, the "voices within her head" provided by research

project operators would convince her to do something often erratic,

which at times would cause them to be required for look for further

shelter, as hotels and short term housing rentals would ask them to

leave as if discrimination or domestic disturbance was ensuing due to

Prices erratic and at times noticeably odd behavior, causing further

financial strain and relationship friction between the two.  She would

often run off or scream even in confusion thinking he was a generally

well received associate they both commonly knew by another name

unrelated to the matter in general.

59.)      Price was led to believe for a period of time that Robinson was a

"robot" and that a robot invasion of the world was ongoing, and hit

Robinson in the arm with a tire iron on the side of the road at one

point causing minor injury, after Robinson negligently let Price drive

a vehicle early November 2015 during one of the periods he was able to

get her sheltered safely within his custody.  Price unaware of reality

at the time accelerated to beyond 90 miles per hour, approaching a

hard curve when Robinson dropped the vehicle from Drive to Neutral in

gears unknown to the driver and most likely saving both their lives.

Robinson described their survival of the incident as sheer luck.

60.)   Price nearly got hit by vehicles an estimated 3 times throughout the ordeal, once seriously in Atlantic City on a rainy day when a motorist was amazed to have been able to stop their vehicle.  Price was nearly assaulted in San Francisco by a transient male at 4 A.M. for assuming him to be of a different identity due to neurological confusion during the accelerated exposure of electricity during the test process, which was notably different at times through psychological output and behavior as well as confusion.  Robinson was present both times, and consistently overprotective of Price, much to her misunderstanding of circumstance and remembrance of both events.

61.)   Plaintiff's lived without shelter in a rental car out of hotels from on or around November 12, 2015 until January 20, 2016 as they felt continuous motion to be less risk in fatality and often questioned "why Barack Obama's Administration would sign such a disgusting violation of their born rights as American's, as well as in violation of their Human Rights standards set forth by the United Nations".

62.)   Price lacked the ability to take physical care of herself in appearance from suffering from a diminished capacity from September 2015 through February 2016.

63.)   Price became pregnant with Robinson's child in early January 2016 and frequency based wave communications continued to do unknown damage

to her and child until on or around March 15, 2016. Price also had at

two miscarriages from January 2015 until March 2016 later assumed from

electricity based exposure during research.

64.)    Robinson was informed through the communications that the legal

order required the research testing for both victims to cease on the

same date and time, however Price was "freed" from her "thought and

communicatively locked in captors" on or around March 15, 2016 in

violation of the original Presidential research and development order

in which the communications just ceased without warning also

contradictory to what was stated as it may induce psychological effect

short and long term.

65.)    Robinson frequently lost items due to the distracting

communications, including state identification roughly 6 times over

the course of the time period, making travel near impossible as well

as refuge to another country through obtaining a passport.

66.)    Robinson contacted Saudi Arabia, Germany, France, Ireland, Canada

as well as several other United Nations countries to let leaders of

the world possibly convince the President that he acted in an "over

the top, possibly insane manner" through this order in essence

selecting parties against their knowledge and against their will for

Medical Process in the advancement of technology, with regards to the

war on terrorism and its seeming never end.

CIVILCOMPLAINT UNLIMITED - 26

67.) The communications event in itself could be described as a non-stop interrogation, as there was no allotted lapse or break and was extremely coercive of providing Plaintiff's with forced views and expressions on the world, as well as forced opinions and input. Price often stated that it seemed to be a computerized tone, at times she mentioned story tale as well invoking the names "Joone" and mentions of the "CIA" and "KGB", as if being told a politically related story.

68.) Commentators would often try to scare Robinson by yelling the words "un-implied consent" repeatedly in an attempt to make him assume his residence was getting raided from Police for wrongdoing after he was up late at night or if he was not cooperating with the projects forced itinerary, of which he was provided nothing in document. It was unknown what implying consent meant towards Robinson, although Price seemed unfamiliar with this meaning of the term when later asked.

69.) Odd statements made during commentary at very off hours of the evening immediately prior to Robinson going to sleep seemed to be made in attempts to drive fear or raise his heart rate in an unhealthy or health defect inducing fashion, as well as prevent him from sleeping, which in turn made it hard to go to work the following day from staying awake in fear of home invasion's or arson, as well as other conceivable later illogical thoughts pushed on him.

70.)    Plaintiff's made plan's to backpack on foot across Canada's land border near Bellingham, WA illegally in January 2016 to seek refuge, but Robinson later declined to put Price at such great risk as her condition was varying during that period.  It is unknown if the processes would have stopped had they crossed a land border, or reached international airspace or waters, in respect to the sovereignty of other nations, and doubted by Robinson, as he reached out to the State Department as well for protection's from abuse.

71.)    Plaintiff's first filed a civil complaint on the matter with the Judiciary District Courts in October and amended the complaint to be more specific on November 3, 2015 and yet again with this draft of the complaint.

72.)    The United States District Court in Northern California was petitioned for a Temporary Restraining Order Pro Se on 11/2/2015 and the motion was denied by Judge XXXXXXX due to the vagueness and the requirements set forth in previous legal filings.

73.)    The matter was reported to the White House 50 times, including certified USPS and FedEx through various offices, as well as 10 times to The Executive Office of the President, as well as Chief of Staff Denis McDonough's office at least 10 times.  The White House counsel was civilly served with its first claim regarding the matter on November, 10 2015 at 8:57 AM and signed for by C. McCombs, which at

CIVILCOMPLAINT UNLIMITED - 28

the time reported explicitly in typed print that under a White House Obama Administration Order, research testing mimicking torture was occurring to both Plaintiff's and no action or return communication to stop the matter was taken in negligence.   Suicide Prevention telephone advisors retained by the White House contacted Robinson at one point in December, showing even further disconnect between the "Palace and its test subjects", according to Robinson

74.)    Robinson was also told to write Political Leaders, Police, Federal Authorities, as well as private interest groups and possibly that would make it so that the research testing cease.   Plaintiff spent an estimated $5000 in supplies to ship, fax and communicate with outside parties the matter of the on-goings, eliciting very little response.

75.)    The Department of Justice was contacted directly over 20 times, as well as the FBI several thousand times including every single major division nationwide including hundreds of agents individual work emails sourced from the internet over multiple days, Homeland Security 10 times estimated received reporting of the matter, California Department of Justice five times, Nevada State law enforcement officials, INTERPOL, Governor Edmund Gerald Brown, Lt. Gov. Gavin Newsome, The United Nations, every single United States Attorney several times, Contra Costa County District Attorneys as well as numerous politicians, as well as several hundred other private

industry leaders nationwide including CEO's of multiple Fortune 500 companies in attempts to get ahold of the President.

76.)    Medical Records for both Plaintiffs were obtained, including sealed childhood records.

77.)    Both Plaintiffs are timid and nervous to reside within the United States after such a torturous ordeal, with access to justice being deprived for over a year.  Both Plaintiffs have looked refuge in other countries, including Mexico and Canada and have made serious considerations due to the potential for further personal abuse and specific persecution from government.

78.)    Robinson's business was destroyed by Project, whereas it was quite dominant before within local and national markets for specific products. Both Plaintiff's families were becoming distrustful of them, as the on-goings could not be conceived as logical and the two must be "on drugs or suffering from mental illness", which in turn caused stress to both mother and father, as well as siblings to both parties.  This made it near impossible to obtain lending for Compressed Solutions.

79.)    Neuromodulation is performed through electromagnetic wave, which is a known carcinogen, meaning that it causes cancer in human beings. Continuous exposure for this length without variance or in defiance of

CIVILCOMPLAINT UNLIMITED - 30

free will (forced) is unreported.  The long term health effects are unknown and thought to be negative. Similar studies have documented the effects of RF or radio frequency emitted from cell phones and have shown negative health effects.

80.)    The only politician that was kind and courteous to return correspondence with Robinson, was the candidate he now questions not voting for in prior election, Senator John McCain.

# Cause for Action 1

## Invasion of Privacy

81.)    Plaintiff reaffirms everything listed previously as factual allegations 1-80 and brings forward the following reasons as cause for action.

82.)    By being forced party to this program, in which they were documented against their wishes and in summary, illegally profiled, Plaintiff's privacy was grossly invaded in a sharp intrusive manner by third party acting on behalf of government

CIVILCOMPLAINT UNLIMITED - 31

or through government order, in which their lives were

potentially permanently altered from the path they were on.


83.)    Throughout the program, they were monitored 24 hours a day,

7 days a week without relent, and communications were non-stop

without even a five second gap between spoken word. Plaintiffs

time and time again asked research test operators to cease and

desist, in less formal but well communicated ways and respect

their rights to privacy on public property and within the

confines of their own home and even within their bedroom during

the couples intimate time, none of which was respected or

honored in violation of their right.


84.)    Rights to Privacy were also not respected additionally when

Plaintiffs were in hospitalized care during the research

program, as communications did not cease during in patient

hospitalization in continued pattern of intrusiveness of this

program.


85.)    Plaintiff asks for Prayer for Judgment for this cause as

well as the following causes.


Cause of Action 2

CIVILCOMPLAINT UNLIMITED - 32

Defamation of Character

86.)    Plaintiff reaffirms everything listed previously as factual

allegations and brings forward the following reasons as cause

for action.


87.)    Robinson's character was damaged beyond repair with the

business setting for Compressed Solutions as customers,

employees and lenders believed the allegations of him purported

by the Antioch Police Department, as well as the County Mental

Health Workers, whom called his parents repeatedly at Christmas

time illegally leaking confidential medical information as his

HIPPA Rights were not honored, and negative as well as untrue

information was conveyed to third party (in this case his

parents) without any approvals in violation of the Law, which

caused a further strain on his business and his reputation with

his peers.


88.)    Antioch Police Officers compared Robinson to individuals

within the community, making a direct relation to Robinson and

local drug users by descriptive wording, which left a deep

impact on Robinson's father upon visit to California and causing

great infliction of harm on his relationship with his parents.

89.) Furthermore, contrary to what the Obama Administration work order states, Plaintiffs have never had any ties to any gangs or organized crime networks, and any allegations of ties to street rackets are in fact further defamation of character upon any of these documents becoming public, or even in consideration by the research project operators themselves as individuals as Plaintiffs were assumed by all purposes to have established street rackets.

## Cause of Action 3
### Intentional Infliction of Emotional Distress

90.) Plaintiff reaffirms everything listed previously as factual allegations 1-80 and brings forward the following reasons as cause for action.

91.) By mimicking sexually provocative sound effects in the tone of Plaintiff's partner Price, Robinson was caused an intentional infliction of emotional distress that is not logical or seen by Plaintiff's as relevant to the research test process.

92.)    While the research project tested a number of different facets of satellite advancements involving neurostimulation, and the EEG style thought reading communications without electronic device, the noise effects created a dangerous situation for Price as well as her sister during her term as short term resident of the household in Antioch.

93.)    Often times Robinson would lash out verbally or at times physically due to the incessant sound effects that were overdubbed in Price's vocal tone and would at times throw objects, play music in middle hours of the night as well as punch walls, and slam doors due to the confusing sound effects produced and distributed throughout the household during the testing process, to which the entire term was unconsented by both Robinson and Price.

94.)    It is unknown what long term psychological effect this had on both Price and her sister, although it left a long lasting confusion and sorrow with Robinson.

95.)    Plaintiff asks for Prayer for Judgment for this cause as well as the following summary conclusions for the damages caused to both Plaintiffs.

## Summary Conclusion and Prayer for Relief

96.)    Plaintiff's after stating the following, wish for the court
to hold the defendants accountable for the invasion of their
privacy and defiance of the beauty that is the creation of man,
woman or life, defiance to their rights to freedom and their
original plans within their life and the fulfillment of their
dreams, the violation of their Constitutional Rights which they
were guaranteed at birth as born citizens of the United States
of America, the defiance of the articles applicable in the
Geneva Conventions of the 1950's regarding acceptable treatment
of civilians as well as Prisoners of War during times of war and
times of non-wartime.

97.)    Thousands of dollars of items were either damaged or lost
throughout the ordeal, including rental cars, one of which stolen at
4AM in a near violent altercation, and physical damage to several
others, as well as near losses of life to both Natural born American
Citizens, Price and Robinson, whom were never sentenced with this
cruel and unusual punishment in a court of law, in which their thought
process and future accomplishments may now be permanently altered
through the rest of their lives as neurological processes and

CIVILCOMPLAINT UNLIMITED - 36

functions were altered at the hands of man, through government written action.

98.)    Plaintiff's argued mercilessly throughout the ordeal, becoming distanced at times. Unquestionable hurt was brought upon the shoulders of both parties, unknowing as to what they did to deserve such hurt from this world. Price sought refuge at a maternity home in Orange, California on March 10, 2016 as Robinson grew deeper into an almost maniacal depression with extremely erratic behavior, as auditory testing involving the sexually harmful and explicit communications overdubbed in Price's vocal tones continued into 2016 once Plaintiff's moved into a new residence in Henderson, Nevada on January 20, 2016.

99.)    Compressed Solutions plans to shut its doors and expected to sell its assets off in April 2016, in order to provide stability to Plaintiff's future lives with great uncertainty and the life of the unborn child greatly affected from this written action allowing the modification of two human beings previously overjoyed to be alive and healthy.

100.)    Plaintiffs combined savings were destroyed from seeking refuge from the distracting and psychologically destructive

communications, which were grossly logic inhibitive with regards to Robinson's thoughts and ideas about his line of work, as well as depression and later isolation inducing. It is unknown his mental capacities long term as far as potential for future employment or if he will ever be able to think on the same level of conscious awareness as he once was without emotional trauma or distrust for people in general or psychological defect.

101.)   Robinson became repeatedly frustrated and disillusioned with living life from the Project and its "(extortive) refusal to not provide a length of term or end date" on top of the destruction it had caused his and Price's life with inability to get anyone within the United States to understand, let alone assist with securing their liberation and freedom from the Project, whose end goal was to stop terrorism in a manner that seemed consistent with terrorism style attack on Price and Robinson's ways of life as well as happiness within life with no monetary demand similar to extortion tactics used by the same terrorists the project would one day eradicate.

102.)   Price did not have as deep of a political understanding of why the matter was occurring or what was to be gained from it, and at times was not sure if she was sick, or if it was in her head at times.

During several points, she was lead to believe there was an ongoing

process of a robot invasion of the world, with robots taking

inhabitance inside people's bodies, which she consistently referred to

as "roboting". It can be questioned if she was fit psychologically to

have the research testing in the first place, due to her potentially

questionable mental capacities and at times back and forth inability

to distinguish between the reality and psychological fantasy of the

on-going's, or if even damage was done throughout the term.

103.)    It is estimated the company lost $250,000 in potential

revenues in 2015 due to distraction by researchers as well as

unknown tax implications, $70,000 in assets which were stolen

due to inability to function, while Plaintiff lost $75,000 in

savings as well as all potential for saved income in 2015 and

partially 2016, which was estimated to be around $85,000 in 2015

and $40,000 in 2016 as well as unresolved medical debt and

credit reporting negativities, which further defamed Plaintiff

characters. It is unknown what permanent physical impact this

will have on Plaintiff's lives moving forward, or emotional

strength it will take for them to move forward.

Plaintiff Robinson remarked that "this was the cruelest, most

inhumane thing that has ever happened to him from any human being,

let alone a President of the United States to alter the biology and thought process of an individual of a human being, without regard for who they were, what special qualities they possessed, their potential within the world or ability to achieve and furthermore, for any individual to act so specifically in persecution or so powerful as if they were God".

*Wherefore*, Plaintiffs pray for judgement in favor of them from defendants in a trial by Jury peers, for a **damages not to exceed** **$100,000,00 (One Hundred Million Dollars)**

Dated this Seventh day of April, 2016

_____
Scott Robinson, Pro Se.

_____
Jenetta L. Price, Pro Se.

CIVILCOMPLAINT UNLIMITED - 40